NATIONAL RENDERERS ASSOCIA-
TION et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY and Russell E. Train, as
Administrator, Respondents.

No. 75–1182.

United States Court of Appeals,
Eighth Circuit.

Submitted March 8, 1976.

Decided Aug. 30, 1976.

Edward W. Warren, Kirkland, Ellis & Rowe, Frederick M. Rowe, Washington, D. C., G. Lane Roberts, Jr., St. Louis, Mo., for petitioners; Philip J. Davis, Kirkland, Ellis & Rowe, Washington, D. C., on brief.

Lloyd S. Guerci, Atty., Dept. of Justice, Land & Natl. Resources Div., Edmund B. Clark, Atty., Dept. of Justice, Land & Natl. Resources Div., Washington, D. C., for respondents; Peter R. Taft, Asst. Atty. Gen., and Alfred T. Ghiorzi, Atty., Dept. of Justice, and Lee E. Caplin, Atty., EPA, Washington, D. C., on brief.

Before GIBSON, Chief Judge, and HEANEY and WEBSTER, Circuit Judges.

HEANEY, Circuit Judge.

The National Renderers Association, Inc., and its member companies, seek direct review of regulations promulgated by the Environmental Protection Agency setting forth standards of effluent discharges from new plants in this industry under § 306 of the Federal Water Pollution Control Act Amendments of 1972. 33 U.S.C. § 1316.

The rendering industry converts inedible animal raw materials into salable by-products for commercial use. The challenged regulations apply only to rendering operations conducted separate from slaughter or packing houses. These "independent" renderers pick up the animal waste left over at various meat and poultry processing sites, as well as dead animal stock from farms, and convert it into high protein meat-meal, tankage and inedible grease for animal and poultry feed, and tallow for soap and derivatives in the chemical industry. The raw materials, which are perishable, must be processed without delay. The renderers' collection area is generally restricted to a 150-mile radius.

On January 3, 1975, the EPA promulgated final regulations for the independent rendering industry. These regulations include "guidelines" for existing plants in the industry to be met by 1977 and 1983, and

"standards" to be met by any new plants constructed after the effective date of these regulations. *See* 33 U.S.C. §§ 1311(b), 1314(b) and 1316(b).[1] Under these regulations, the average of the daily value for thirty consecutive days may not exceed:

### EFFLUENT CHARACTERISTICS

| | Pounds of Effluent Per 1,000 Pounds of Raw Material Processed | | | | Within the Range | Mpn/ ml |
|---|---|---|---|---|---|---|
| | $BOD_5$ | TSS | Oil & Grease | Ammonia | pH | Fecal Coliforms |
| 1977 | 0.17 | 0.21 | 0.10 | – – | 6.0–9.0 | 400 |
| New | 0.17 | 0.21 | 0.10 | 0.17 | 6.0–9.0 | 400 |
| 1983 | 0.07 | 0.10 | 0.05 | 0.02 | 6.0–9.0 | 400 |

40 C.F.R. §§ 432.100–432.106.[2]

Small independent rendering plants that process less than 75,000 pounds of raw material per day are exempt from these regulations. 40 C.F.R. § 432.101(b).

■ We are concerned here only with the new source standards. These standards should reflect "the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology." 33 U.S.C. § 1316(a)(1). In making this determination, the Administrator is required to consider the cost of achieving the necessary effluent reduction, 33 U.S.C. § 1316(b)(1)(B), and whether the cost is reasonable. *CPC International, Inc.,* *et al. v. Russell E. Train, et al.,* 540 F.2d 1329, at 1340–1342 (8th Cir. 1976) (*CPC II*).

■■ Our task is to determine whether the EPA's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *CPC International Inc. v. Train,* 515 F.2d 1032, 1044 (8th Cir. 1975) (*CPC I*). To enable us to perform that task, the EPA must explicate fully its course of inquiry, its analysis and its reasoning. *Appalachian Power v. EPA,* 477 F.2d 495, 507 (4th Cir. 1973); *Kennecott Copper Corp. v. Environmental Protection Agcy.,* 149 U.S.App.D.C. 231, 462 F.2d 846, 848–849 (1972).

1. The 1977 guidelines "require the application of the best practicable control technology currently available" and must be met by existing plants on July 1, 1977. 33 U.S.C. § 1311(b)(1)(A). These regulations shall be revised on an annual basis if the EPA deems it appropriate. 33 U.S.C. § 1314(b).

The 1983 guidelines "require application of the best available technology economically achievable" and must be met by existing plants on July 1, 1983. 33 U.S.C. § 1311(b)(2)(A).

These regulations must be reviewed every five years, 33 U.S.C. § 1311(d), and shall be revised annually if the EPA deems it appropriate. 33 U.S.C. § 1314(b). Any plant built after October, 1972, which meets "all applicable standards of performance shall not be subject to any more stringent standard of performance during a ten-year period beginning on the date of completion * * * or during the period of depreciation or amortization * * * whichever period ends first." 33 U.S.C. § 1316(d).

2. The maximum effluent level for any one day is:

| | Pounds of Effluent Per 1,000 Pounds of Raw Material Processed | | | | Within the Range | Mpn/ ml |
|---|---|---|---|---|---|---|
| | $BOD_5$ | TSS | Oil & Grease | Ammonia | pH | Fecal Coliforms |
| 1977 | 0.30 | 0.40 | 0.20 | – – | 6.0–9.0 | 400 |
| New | 0.30 | 0.40 | 0.20 | 0.34 | 6.0–9.0 | 400 |
| 1983 | 0.14 | 0.20 | 0.10 | 0.04 | 6.0–9.0 | 400 |

█ No serious challenge can be made to EPA's determination that there is presently available demonstrated control technology that will enable new rendering plants to meet the proposed new source standards.[3] Such is not the case, however, with respect to its determination of the technology required to meet the standards, the cost of that technology and the reasonableness of that cost. *See CPC International Inc. v. Train, supra* at 1044–1051 (*CPC I*).

The petitioners argue that technology other than that specified by the EPA will be needed. They also argue that the initial cost of the technology will be higher than estimated and that annual costs[4] will be so high that new plants will not be built. We turn to a detailed consideration of these issues.

### THE REQUIRED TECHNOLOGY

The petitioners assert that new plants must include the following in-plant equipment in addition to that specified by the EPA if new source standards are to be met: an equalization tank with agitator and pump (for medium-size plants), an air flotation system, a pump and piping to recirculate condenser water, a recycling system for air scrubber water and equipment for the segregation of drainage.

█ The EPA's decision that a recycling system for air scrubber water and equipment for the segregation of drainage need not be included in the cost of technology required to meet new source standards is not arbitrary and capricious. This record gives support to the EPA's finding that this equipment would be installed in any well-designed new plant whether or not the new source standards were in effect. It also supports the EPA's finding that including this equipment in the new plant would have a *de minimus* effect on the total cost of the new plant.

█ The EPA's decision that an equalization tank and an air flotation system can be excluded is, on the basis of this record, arbitrary and capricious.

The equalization tank, with agitator and pump, will cost approximately $7,000. This equipment will reduce shockloads, equalize flow and minimize the need for larger and more sophisticated lagoons or other "end of pipe" treatment. The equipment can be installed most efficiently and economically at the time the plant is built. Delay in installation will mean added expense and inconvenience at a later day. *See* pp. 1289–1290, *infra.*

Air flotation systems, costing approximately $45,000 are admittedly more effective in removing grease and solids than the alternate system suggested by the EPA, catch basins and mechanical skimmers, costing $15,000. The more sophisticated flotation systems will enable the industry to meet the new source standards in the most

---

**3.** On the basis of a field sample and a questionnaire verified by field survey, at least one large existing plant now meets the stricter 1983 standards. This plant uses the following technology: (1) shell and tube condenser for cooling, (2) two primary settling tanks, and (3) a complete activated sludge system that includes four aeration basins and two final settling tanks with complete recycling of the remaining sludge. The technology was estimated to have cost $300,000.

At least two additional medium-size existing plants now meet all the 1977 standards. One plant uses: (1) a barometric condenser with separate discharge facilities, (2) a stationary catch basin, and (3) a series of two anaerobic lagoons in series followed by three aerobic lagoons in series. The second plant uses: (1) a Pacific Separator air flotation basin, and (2) an anaerobic lagoon followed by an aerobic lagoon that, in turn, is followed by a large aerobic pond with six months holding capacity for eventual spray irrigation over seventeen acres. The technology for this facility was estimated to have cost $150,000.

The only technology required to meet new source standards in addition to that required to meet the 1977 existing plant guidelines is ammonia stripping equipment. The EPA's determination that technology exists to reduce the ammonia content to meet the new source standards is adequately supported by the record.

**4.** Annual costs include: (a) capital and depreciation expenses, and (b) operational expenses. A capitalization rate of 10% is used by the EPA and not challenged by the petitioners; thus, an increase in investment of $1,000 will result in a $100.00 increase in operating cost.

cost-effective way. The equipment will be necessary to meet the 1983 standards. If the equipment is not installed during initial construction, it will have to be installed after ten years with added installation and operational expense and inconvenience. *See* pp. 1289–1290, *infra.*[5]

■ The EPA concedes that a pump and piping to recirculate condenser water will be necessary if new source standards are to be met. It argues, however, that the cost of this equipment should not be included as a cost of meeting water pollution control standards, but should be charged instead to the cost of meeting air pollution control standards. This is bureaucratic nonsense. The cost is reasonably related to water pollution and should be so considered. Moreover, § 306(b)(1)(B), 33 U.S.C. § 1316(b)(1)(B), requires that the non-water quality environmental impact be considered in establishing new source standards. *Appalachian Power Company, et al. v. Russell E. Train, etc., et al.*, Nos. 74–2096, et al., Slip op. at 17–19 (4th Cir. July 16, 1976).

The petitioners argue that the lagoon system suggested by the EPA is too small and inadequately designed. The EPA contends to the contrary. We are unable to resolve the controversy from this record. The size and design of the lagoon system is significantly affected by the in-plant controls. Now that we have determined that additional in-plant controls are necessary for new plants, the EPA shall reconsider the size and design of the lagoon system, shall determine the cost of the system selected and shall set forth the reasons for its decision in detail. In this reconsideration, a decision should be made as to whether or not the lagoons should be lined. If states generally require lined lagoons to prevent seepage of contaminated waste water, they should be included in the suggested technology to meet the new source standards and the costs of installing such liners should be

included in the total costs to meet the new source standards.

■ The petitioners finally contend that a sand filtration unit is necessary to meet the 1983 standards. They argue that it is prudent to incorporate such a unit in a new plant and that the costs associated therewith should be included in the overall cost of meeting the new source standards. While there may be merit to this position, *see* pp. 1289–1290, *infra*, the EPA's decision to the contrary is not an arbitrary and capricious one. The record supports the view that filtration units, as distinguished from in-plant controls, can be added after the new plant is built without significant additional costs or inconvenience. There is one exception. The land necessary for the filtration unit should ordinarily be acquired when the land for the plant is acquired, and the cost for it should be included in determining the total water pollution control cost for a new plant.

## THE COST OF THE TECHNOLOGY AND THE REASONABLENESS OF THAT COST

We turn to the question of whether the cost of achieving the new source standards is reasonable. The EPA retained consultants to assist them in answering that question. The consultants prepared an excellent economic analysis insofar as existing plants were concerned. They accepted as valid, however, the capital investment and annual costs projected by the EPA in its first Development Document, dated August, 1974. Relying on these costs, they projected before and after-tax net income and cash flow for small, medium and large-size existing plants installing the water pollution control equipment suggested as necessary by the EPA. No similar analysis was made with respect to new plants. With new plants, the analysis was limited to projecting the incremental effluent control costs.[6] The consultants concluded that

---

**5.** The EPA states that the equalization tank and the air flotation system could be added at a later time if the piping were installed and capped at the time the plant was built. The statement is not supported by engineering or

cost data. This alternative can be explored on remand.

**6.** The costs for a medium-size continuous operation were estimated to be:

the cost of controls to meet the 1977 guidelines would cause many small plants to close,[7] and that the cost of the 1983 controls would cause additional medium-size plants to close and substantially reduce the profitability of larger plants. A general conclusion, seemingly applicable to new plants as well as existing plants, was that the industry "does have the ability to raise reasonable amounts of capital for pollution control equipment, either through retained earnings or debt capital."

The Economic Analysis suffers from two fundamental weaknesses: (1) the cost figures used to determine economic impact were stale, and (2) the economic impact analysis for new plants was insufficient to permit any conclusions as to their economic viability.

The cost estimates for the technology necessary to meet the new source standards used by the consultants were substantially increased by the EPA in its second and final Development Document, dated January, 1975.[8] The estimated pollution control capital costs for a medium-size plant were increased by the EPA from $79,100 to $148,000 and those for a large plant from $118,400 to $220,000. The EPA, however, did

not give the consultants an opportunity to reconsider their conclusion of economic viability after making these changes. The EPA merely commented that:

> Economic impact analysis reveals no adverse impact on renderers to meet BPT [1977] requirements * * *. A moderate impact on medium size plants with batch cooker systems may occur for 1983.

40 Fed.Reg. 904 (1975).

█ This failure of the EPA to give the consultants an opportunity to reconsider the impact of the cost of controls on economic viability or to reconsider the impact itself was arbitrary and capricious. The error was compounded by failing to include the cost of some of the pollution control equipment necessary to achieve the standards. *See* pp. 1289–1290, *supra*. These errors cannot be ignored as minimal. The capital cost for pollution control equipment for a medium-size continuous operation plant, including all equipment required, would apparently be increased by approximately $122,000 by these changes. The total cost of technology—$200,000—is more than double the cost used by the economists.[9]

This projected increase in capital cost would also have the probable effect of increasing annual costs by approximately

| | Investment | Annual |
|---|---|---|
| To meet 1977 Standards | $29,100 | $17,010 |
| To meet 1983 Standards | $86,100 | $40,910 |
| To meet New Source Standards | $79,100 | $30,510 |

7. In light of this conclusion, the EPA revised its guidelines for this industry by exempting small plants that process less than 75,000 pounds per day. *See* § 432.101(b).

8. The petitioners also complain because 1971 data was used in determining investment and annual costs. The explanation given by the EPA for using this data is a rational one, *i. e.,* that the 1972–1973 data was unrepresentative in that it indicated a profit level higher than could reasonably be expected. *Compare CPC International Inc. v. Train,* 515 F.2d 1032, 1051 (8th Cir. 1975) (*CPC I*), where no rational basis was shown for using stale data. In view of the fact, however, that a remand is required for other reasons, it would be appropriate for the EPA to use the most recently available representative data.

The EPA should also consider the National Commission on Water Quality study that suggests the investment cost estimates for the independent rendering industry for water pollution controls may be higher than those estimated by the EPA.

9. WATER POLLUTION CONTROL CAPITAL COST FOR A NEW MEDIUM–SIZE RENDERING PLANT

| | |
|---|---|
| EPA's Original Projection, August, 1974 | $ 79,100 |
| EPA's Final Projection, January, 1975 | $148,000 |
| Additional Technology Required by This Opinion | $ 52,000 |
| Total Technology Cost | $200,000 |
| Difference Between EPA's Original Projection and Proposed Actual Cost | $120,900 |

$12,090.[10] In light of the consultants' conclusions that after-tax income as a percent of average invested capital would be 7.5% for a medium-size continuous plant meeting 1977 guidelines and 3.8% for a similar plant meeting 1983 guidelines, it cannot be said that annual cost increases of $12,090 would not substantially affect the economic viability of medium-size new plants.[11]

We also find error in the failure of the EPA to have the consultants calculate separately and independently the impact of the cost of controls on new plants. They did estimate, from the data given to them by the EPA, the annual incremental effluent control cost for new plants. They did not, however, complete this analysis by showing for new plants, as they did for existing plants, the manner in which pre-tax and after-tax income, cash flow as a percentage of sales and invested capital would be affected by the additional annual cost. Nor did they attempt to ascertain how net present value of new medium and large-size plants would be impacted by the new source standards.[12] We cannot possible determine economic viability from this record.[13] Costs are too important to large segments of this industry. Raw material costs are highly volatile, profit margins fluctuate widely and it is relatively difficult, especially for rural renderers, to pass on added costs to either the producer of the raw materials or the consumers of the finished product.

The matter must be returned to the EPA for a thorough analysis based on complete, accurate and current representative data.

## THE RELATIONSHIP BETWEEN NEW SOURCE AND 1983 STANDARDS

There is an additional important problem with respect to the new source standards. Unlike some other standards promulgated by the EPA, *see e. g.,* wet corn milling standards discussed in *CPC I,* the new source standards permit higher levels of effluent than do the 1983 existing guidelines, notwithstanding the fact that the best available effluent control technology would appear to permit achievement of the 1983 standards in new plants. There is no explanation for this anomaly in the briefs, and counsel for the EPA was unable to give a rational reason for it at oral argument.[14] The standards would thus appear on their face to be inconsistent with Congressional intent that new sources employ the most advanced current technology:

> The standards of performance for new sources of water pollution would require the achievement of the *greatest* degree of pollution reduction that can be achieved

---

**10.** The consultant estimated the annual cost for a continuous operation medium-size plant as follows:

| | |
|---|---|
| Capital | $ 3,200 |
| Depreciation | $ 7,910 |
| Operating | $19,400 |
| Total | $30,510 |

**11.** No similar data is shown for new plants. The economic consultants conclude that the industry has maintained a profit position comparable to the average manufacturing plant in the United States without stating what that average is. They also conclude that the industry is currently in a reasonably good financial position and constantly makes new capital investments in existing plants. The question that must be answered on remand is whether after-tax net income, cash flow and other economic benefits will be sufficient to justify the construction of new medium and large-sized plants.

**12.** As we noted in *CPC International Inc. v. Train, supra* at 1051 (*CPC I*), the cost of controls for new sources should not be derived solely from the projection of costs to modify existing plants even if the new source standards are the same as those for 1983 existing plant guidelines. Nor should the economic impact for new plants be assumed to be the same as that for existing plants even if the standards are the same. The impact may be less but we cannot assume this to be the case.

**13.** Review in matters of this kind would be facilitated if the practice of xeroxing handwritten studies was discontinued. The least that can be expected is to have these studies and reports typed.

**14.** The standards for other subcategories within the meat products and rendering process industries follow this same pattern while others do not. *Compare* Simple Slaughterhouse subcategory 40 C.F.R. §§ 432.10–432.16 and Small Processor subcategory 40 C.F.R. §§ 432.50–432.56. The briefs of the parties have not

through the application of best available effluent control technology. \* \* \* Such a maximum use of available means to prevent and control water pollution is essential to the prevention of new pollution problems and the eventual attainment of the goal of no discharge.

\* \* \* \* \* \*

The *overriding* purpose of this section would be to prevent new water pollution problems, and *towards that end, maximum feasible control of new sources,* at the time of their construction, is considered by the Committee to be the most effective and, in the long run, the least expensive approach to pollution control.

*A Legislative History of the Water Pollution Control Act Amendments of 1972,* 93rd Cong., 1st Sess. (Comm.Print 1973) at 1475–1476 [Emphasis added.].

The House Public Works Committee was similarly emphatic:

In section 306, the Committee recognizes two of the most significant factors in the attainment of clean water. These factors are (1) the need to preclude the construction of new sources or the modification of existing sources which use less than the best available control technology for the reduction or elimination of the discharge of pollutants and (2) the recognition of the significantly lower expense of attaining a given level of effluent control in a new facility as compared to the future cost of retrofitting an existing facility to meet stringent water pollution control measures.

\* \* \* \* \* \*

New sources [that] discharge pollutants \* \* \* *must* be constructed to meet a standard of performance that reflects the *greatest* degree of effluent reduction that can be achieved by use of the best availa-ble demonstrated control technology, processes, or operating methods for. that category of sources, and for class, types, and sizes within categories of new sources. If it is practicable, a new source performance standard could prohibit any discharge of pollutants.

*Id.* at 797–798 [Emphasis added.].

 We could speculate from the record and from the arguments that had been advanced that the new source standards were set at lower levels because the EPA felt that the cost of including the technology necessary to meet the 1983 standard would be so high that no new plants would be built. If this is the reason, then the EPA should say so forthrightly. If this is not the reason, the real reason should be given and justification should be set forth in the record.

We do not suggest that the new source standards should be the same as the 1983 standards. We suggest only that the matter be thoroughly reviewed on remand. In this connection, the EPA may, because of the unique nature of this industry, find it necessary to develop variable standards based on geography and/or plant size. Standards based on these criteria might do more towards meeting the congressional goals than the present standards which simply exempts small plants from all federal effluent controls.[15] We have no desire to limit the choices available to the EPA; we intend only to encourage it to make the choices which will best effectuate congressional intent and to explicate fully its reasons for so doing. In this connection, the rendering industry could be more helpful than it has been to date. It could play a positive role by suggesting alternatives which would assist the EPA in its task of cleansing the nation's waterways.

---

drawn our attention to any explanation or basis for this practice in the record.

**15.** The Illinois Department of Agriculture made the following comment: "The proper disposal of such products directly affects our environment and any interruption of such service would materially produce adverse ecological circumstances of any area in which it occurred. Any further pressure to cause cessation of activity within the rendering industry should be considered destructive rather than constructive for the protection of our environment." Similar comments from state agencies in Kentucky, Maryland, Pennsylvania and Virginia are included in this record.

## PRETREATMENT STANDARDS

The petitioners also challenge the pretreatment standards set by the EPA for new plants which do not treat waste directly but instead have it treated in publicly-owned treatment plants. They assert that the standards set forth in 40 C.F.R. § 432.-106, as defined in 40 C.F.R. § 128, are "vague" and "uncertain."

■ 40 C.F.R. § 128 sets forth general pretreatment standards, dividing pollutants into two categories: "compatible" and "incompatible." Compatible pollutants are those which treatment facilities are designed to remove and may be introduced into the public treatment works subject to certain limitations. *See* 40 C.F.R. § 128.-131. Incompatible pollutants are not treatable and must be reduced to levels identified in § 301(b) and § 304(f) of the Act. 33 U.S.C. §§ 1311(b) and 1314(f).

■ Since the discharge of rendering industries is composed of compatible effluent, pretreatment is not required except for the limitation set out in 40 C.F.R. § 128.131. This section prohibits the introduction of waste into a treatment plant which may create fire, corrosive damage or solid waste that may obstruct the wastewater ·flow. 40 C.F.R. § 128.131(a)–(c). Subparagraph (d) prohibits the introduction of:

> [w]astes at a flow rate and/or pollutant discharge rate which is excessive over relatively short time periods so that there is a treatment process upset and subsequent loss of treatment efficiency.

In *CPC I,* we concluded that this standard was "too vague to warn the industry of the scope of the prohibited conduct" and ordered the EPA to "define in a reasonably specific manner what it considers to be an excessive discharge to a municipal plant over relatively short periods of time." *CPC International Inc. v. Train, supra* at 1052 (*CPC I*). By referring to 40 C.F.R. § 128.-131(d) in the rendering pretreatment standards without further defining the terms excessive and the discharges prohibited, the EPA is again subject to the same criticism.

■ However, after referring to 40 C.F.R. § 128, the EPA set forth the following qualifying language for the rendering subcategory in 40 C.F.R. § 432.106:

> The following pretreatment standard establishes the quantity or quality of pollutants or pollutant properties controlled by this section which may be discharged to a publicly owned treatment works by point source subject to the provisions of this subpart:

| Pollutant or pollutant property | Pretreatment standard |
|---|---|
| BOD$_5$ | No limitation. |
| TSS | Do. |
| Oil and grease | Do. |
| pH | Do. |
| Fecal Coliform | Do. |

In its comments attached to the standards, the EPA states that it has determined that it will allow "unrestricted discharge to publicly-owned treatment works of materials known to be adequately treated in such works." 40 Fed.Reg. 912 (1975). The regulation and the explanation by the EPA appears to state that notwithstanding the incorporation of the limitation set forth in 40 C.F.R. § 128.131, there is no limitation of compatible discharges in terms of quantity or quality, for independent rendering plants. We so interpret the regulation.

## INFLATION IMPACT STATEMENT

Finally, the petitioners suggest that the standards proposed are inadequate because the EPA has failed to adequately comply with Executive Order No. 11821, 39 Fed. Reg. 41501 (1974). This Executive Order requires any executive branch agency promulgating regulations to certify that the inflationary impact of the regulations has been evaluated and sets forth a number of general categories that must be considered.

In *Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 234–236 (8th Cir. 1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976), we held that:

> Executive Order No. 11821 was intended primarily as a managerial tool for implementing the President's personal econom-

ic policies and not as a legal framework enforceable by private civil action.

*Id.* at 236.

We also held that there was no support for the contention that the President intended "to create any role for the judiciary in the implementation" of this order and reversed a District Court's order setting aside regulations of the Department of Agriculture because of alleged deficiencies in the impact statement. *Id.*

We continue to adhere to this position and, therefore, find no merit in the petitioners' contentions that the standards proposed are inadequate for the alleged failure of the EPA to comply with this order.

## SUMMARY

It follows that on the basis of this record, we have no alternative but to reject the new source standards. There remains the question of remedy. To comply with the congressional intent that the nation's waterways be cleansed at the earliest possible time, we remand to the EPA with the directions set forth below and retain jurisdiction pending remand. *See CPC International Inc. v. Train, supra* at 1049–1052 (*CPC I*). The proceedings in the EPA on remand shall be conducted in accordance with the procedural requirements of the Act, except that the time periods shall be shortened so as to permit the EPA to enter its final order in the matter within 120 days. Within that time, the EPA shall either furnish support for the new source standards previously published or establish new ones which can be achieved with the best available demonstrated control technology. In either event, the EPA shall fully explain the reasons for their choice and it shall set forth in detail and in a manner consistent with this opinion:

(1) the technology required to meet the standard adopted;

(2) the cost of the technology required to meet the standard in accordance with the most recently available representative cost data, and

(3) an economic analysis of the proposed effluent guidelines as they affect *new* plants in the independent rendering industry. This analysis should follow the format used by the consultants who prepared the initial economic analysis and shall be based on the most recently available representative economic data.

Each party to the proceeding shall bear its own costs.