# Proposed Executive Order Entitled "Federal Regulation"

[The following memorandum, prepared by the Office of Legal Counsel pursuant to its responsibility under Executive Order No. 11,030 for approving all executive orders and presidential proclamations for form and legality, analyzes the provisions of a proposed executive order imposing certain procedural and substantive requirements on executive agencies in connection with their rulemaking functions. It concludes that the order's provisions for presidential oversight of the administrative process are generally within the President's constitutional authority, and that they do not displace functions vested by law in particular agencies. It also concludes that the order's requirement that agencies reconsider final rules which have not yet become effective may in certain circumstances trigger the notice and comment provisions of the Administrative Procedure Act.]

February 13, 1981

## MEMORANDUM

The attached proposed executive order was prepared by the Office of Management and Budget (OMB) in consultation with this Office, and has been forwarded for the consideration of this Department as to form and legality by the Office of Management and Budget with the approval of its Director. The proposed order is designed to reduce regulatory burdens, to provide for presidential oversight of the administrative process, and to ensure well reasoned regulations. The order sets forth a number of requirements that Executive Branch agencies must adhere to in exercising their statutory rulemaking authority. We conclude that the order is acceptable as to form and legality.*

The order has the following major provisions. Agencies must take action only if the potential benefits outweigh the social costs; attempt to maximize social benefits; choose the least costly alternative in selecting among regulatory objectives; and set priorities with the aim of maximizing net benefits. All of these requirements must be followed "to the extent permitted by law." The order would require agencies to prepare for each "major rule" a Regulatory Impact Analysis (RIA) setting forth a description of the potential costs and benefits of the proposed rule, a determination of its potential net benefits, and a description of alternative approaches that might substantially achieve regulatory goals at a lower cost. Agencies would be required to determine that any proposed

---

*NOTE: Executive Order No 12,291, entitled "Federal Regulation," was signed by the President on February 17, 1981, 3 C.F.R. 127 (1982 ed.). Ed.

59

regulation is within statutory authority and that the factual conclusions upon which the rule is based are substantially supported by the record viewed as a whole. The Director of the Office of Management and Budget and the Presidential Task Force on Regulatory Relief would be given authority, *inter alia,* to designate proposed or existing rules as major rules, to prepare uniform standards for measuring costs and benefits, to consult with the agencies concerning preparation of RIAs, to state approval or disapproval of RIAs and rules on the administrative record, to require agencies to respond to these views (and to defer rulemaking while so consulting), and to establish schedules for review and possible revision of existing major rules. The order would require agencies to defer rules that are pending on the date of its issuance, including rules that have been issued as final rules but are not yet legally effective, and to reconsider them under the order. By its terms, the order would create no substantive or procedural rights enforceable by a party against the United States or its representatives, although the RIA would become part of the administrative record for judicial review of final rules.

## I. Legal Authority: In General

The President's authority to issue the proposed executive order derives from his constitutional power to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3. It is well established that this provision authorizes the President, as head of the Executive Branch, to "supervise and guide" executive officers in "their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Myers* v. *United States,* 272 U.S. 52, 135 (1926).[1]

The supervisory authority recognized in *Myers* is based on the distinctive constitutional role of the President. The "take care" clause charges the President with the function of coordinating the execution of many statutes simultaneously: "Unlike an administrative commission confined to the enforcement of the statute under which it was created . . . the President is a constitutional officer charged with taking care that a 'mass of legislation' be executed," *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 702 (1952) (Vinson, C.J., dissenting). Moreover, because the President is the only elected official who has a national constituency, he is uniquely situated to design and execute a uniform method for undertaking regulatory initiatives that responds to

---

[1] In *Buckley* v *Valeo,* 424 U.S. 1, 140–41 (1976), the Supreme Court held that any "significant governmental duty exercised pursuant to a public law" must be performed by an "Officer of the United States," appointed by the President or the Head of a Department pursuant to Article II, § 2, clause 2. We believe that this holding recognizes the importance of preserving the President's supervisory powers over those exercising statutory duties, subject of course to the power of Congress to confine presidential supervision by appropriate legislation. *See also* n.7, *infra.*

the will of the public as a whole.[2] In fulfillment of the President's constitutional responsibility, the proposed order promotes a coordinated system of regulation, ensuring a measure of uniformity in the interpretation and execution of a number of diverse statutes. If no such guidance were permitted, confusion and inconsistency could result as agencies interpreted open-ended statutes in differing ways.

Nevertheless, it is clear that the President's exercise of supervisory powers must conform to legislation enacted by Congress.[3] In issuing directives to govern the Executive Branch, the President may not, as a general proposition, require or permit agencies to transgress boundaries set by Congress. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579 (1952). It is with these basic precepts in mind that the proposed order must be approached.

We believe that an inquiry into congressional intent in enacting statutes delegating rulemaking authority will usually support the legality of presidential supervision of rulemaking by executive agencies. When Congress delegates legislative power to executive agencies, it is aware that those agencies perform their functions subject to presidential supervision on matters of both substance and procedure. This is not to say that Congress never intends in a specific case to restrict presidential supervision of an executive agency; but it should not be presumed to have done so whenever it delegates rulemaking power directly to a subordinate executive official rather than the President. Indeed, after *Myers* it is unclear to what extent Congress may insulate executive agencies from presidential supervision. Congress is also aware of the comparative insulation given to the independent regulatory agencies, and it has delegated rulemaking authority to such agencies when it has sought to minimize presidential interference. By contrast, the heads of non-independent agencies hold their positions at the pleasure of the President, who may remove them from office for any reason. It would be anomalous to attribute to Congress an intention to immunize from presidential supervision those who are, by force of Article II, subject to removal when their performance in exercising their statutory duties displeases the President.

Of course, the fact that the President has both constitutional and implied statutory authority to supervise decisionmaking by executive agencies does not delimit the extent of permissible supervision. It does suggest, however, that supervision is more readily justified when it does not purport wholly to displace, but only to guide and limit, discretion which Congress has allocated to a particular subordinate official. A wholesale displacement might be held inconsistent with the statute vesting authority in the relevant official. *See Myers* v. *United States,* 272

---
[2] *See* Bruff, *Presidential Power and Administrative Rulemaking,* 88 Yale L.J. 451, 461–62 (1979).

[3] In certain circumstances, statutes could invade or intrude impermissibly upon the President's "inherent" powers, but that issue does not arise here.

U.S. at 135: "Of course there may be duties so peculiarly and specifically committed to the discretion of a particular officer as to raise a question whether the President may overrule or revise the officer's interpretation of his statutory duty in a particular instance." This suggestion is based on the view that Congress may constitutionally conclude that some statutory responsibilities should be carried out by particular officers without the President's revision, because such officers head agencies having the technical expertise and institutional competence that Congress intended the ultimate decisionmaker to possess.[4] Under this analysis, of course, lesser incursions on administrative discretion are easier to support than greater ones. This Office has often taken the position that the President may consult with those having statutory decisionmaking responsibilities, and may require them to consider statutorily relevant matters that he deems appropriate, as long as the President does not divest the officer of ultimate statutory authority.[5] Of course, the President has the authority to inform an appointee that he will be discharged if he fails to base his decisions on policies the President seeks to implement.[6]

The order would impose requirements that are both procedural and substantive in nature. Procedurally, it would direct agencies to prepare an RIA assessing the costs and benefits of major rules. We discern no plausible legal objection to this requirement, which like most procedural requisites is at most an indirect constraint on the exercise of statutory discretion. At least as a general rule, the President's authority of "supervis[ion] in his administrative control," *Myers* v. *United States*, 272 U.S. at 135, permits him to require the agencies to follow procedures that are designed both to promote "unitary and uniform execution of the laws" and to aid the President in carrying out his constitutional duty to propose legislation. *See* U.S. Const., Art. II, § 3. We believe that a requirement that the agencies perform a cost-benefit analysis meets these criteria. Further, the President's constitutional right to consult with officials in the Executive Branch permits him to require them to inform him of the costs and benefits of proposed action.[7] In our view, a requirement that rulemaking authorities prepare an RIA is the least that *Myers* must mean with respect to the President's authority to "supervise and guide" executive officials.

---

[4] *Cf.* H. Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards 10–11 (1962) (discussing concept of "agency expertise" as reason for delegation of power to particular agencies). The *Myers* Court reaffirmed, however, that even such officers may be dismissed at the pleasure of the President. 272 U.S. at 135.

[5] *See generally,* 1 Op. O.L.C. 75 (1977) (*Proposals Regarding an Independent Attorney General*); 1 Op. O.L.C. 228 (1977) (*Role of the Solicitor General*).

[6] See note 4, *supra.*

[7] *See* U.S. Const., Art. II, § 2 (President may "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices").

Substantively, the order would require agencies to exercise their discretion, within statutory limits, in accordance with the principles of cost-benefit analysis. More complex legal questions are raised by this requirement. Some statutes may prohibit agencies from basing a regulatory decision on an assessment of the costs and benefits of the proposed action. *See, e.g., EPA* v. *National Crushed Stone Ass'n,* 449 U.S. 64 (1980). The order, however, expressly recognizes this possibility by requiring agency adherence to principles of cost-benefit analysis only "to the extent permitted by law." The issue is thus whether, when cost-benefit analysis is a statutorily authorized basis for decision, the President may require executive agencies to be guided by principles of cost-benefit analysis even when an agency, acting without presidential guidance, might choose not to do so. We believe that such a requirement is permissible. First, there can be little doubt that, when a statute does not expressly or implicitly preclude it, an agency may take into account the costs and benefits of proposed action. Such a calculus would simply represent a logical method of assessing whether regulatory action authorized by statute would be desirable and, if so, what form that action should take. In our view, federal courts reviewing such actions would be unlikely to conclude that an assessment of costs and benefits was an impermissible basis for regulatory decisions.

Second, the requirement would not exceed the President's powers of "supervision." It leaves a considerable amount of decisionmaking discretion to the agency. Under the proposed order, the agency head, and not the President, would be required to calculate potential costs and benefits and to determine whether the benefits justify the costs. The agency would thus retain considerable latitude in determining whether regulatory action is justified and what form such action should take. The limited requirements of the proposed order should not be regarded as inconsistent with a legislative decision to place the basic authority to implement a statute in a particular agency. Any other conclusion would create a possible collision with constitutional principles, recognized in *Myers,* with respect to the President's authority as head of the Executive Branch.

We believe that the President would not exceed any limitations on his authority by authorizing the Task Force and the OMB Director to supervise agency rulemaking as the order would provide. The order does not empower the Director or the Task Force to displace the relevant agencies in discharging their statutory functions or in assessing and weighing the costs and benefits of proposed actions.[8] The function

---

[8] The Paperwork Reduction Act of 1980, Pub. L. No. 96–511, 94 Stat. 2812, provides some implied statutory support for the Order by giving OMB a direct role in coordinating agency regulations that impose paperwork burdens on the public. With respect to non-independent agencies the Act gives the Director authority to disapprove "unreasonable" agency collection of information requests. 44 U.S.C. § 3504(h)(5)(C). The Act does not authorize him, however, to disapprove the accompanying rule itself insofar as the two are separable. *See* 44 U.S.C. § 3518(e); S. Rep No. 930, 96th Cong., 2d Sess. 56 (1980)

of the Task Force and the Director of the Office of Management and Budget would be supervisory in nature. It would include such tasks as the supplementation of factual data, the development and implementation of uniform systems of methodology, the identification of incorrect statements of fact, and the placement in the administrative record of a statement disapproving agency conclusions that do not appear to conform to the principles expressed in the President's order. Procedurally, the Director and the Task Force would be authorized to require an agency to defer rulemaking while it responded to their views concerning proposed agency action. This power of consultation would not, however, include authority to reject an agency's ultimate judgment, delegated to it by law, that potential benefits outweigh costs, that priorities under the statute compel a particular course of action, or that adequate information is available to justify regulation. As to these matters, the role of the Director and the Task Force is advisory and consultative. The limited power of supervision embodied in the proposed order is, therefore, consistent with the President's recognized powers to supervise the Executive Branch without displacing functions placed by law in particular agencies.

## II. Suspension of Proposed and Final Regulations

The order requires executive agencies (1) to suspend the effective date of rules that have been issued as final rules, but have not become legally effective; and (2) to reconsider rules that are proposed but have not yet been made final. After suspension of final rules, agencies must reconsider all such rules in accordance with the order. These requirements are imposed only "to the extent permitted by law" and are thus inapplicable when a judicial or statutory deadline requires prompt action. Moreover, agencies must, in complying with these directives, adhere to the requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–706, and all other laws.

For rules that have not yet been made final, the APA imposes no special procedural requirements. Agencies need not follow the notice and comment procedures of 5 U.S.C. § 553, for nothing in that provision requires an agency to allow a period for comment on a decision to delay final adoption of a proposed rule. The agency's decision may, however, be subject to judicial review, and the agency may have to furnish a reasoned explanation for that decision. *See ASG Indus.* v. *Consumer Prod. Safety Comm'n*, 593 F.2d 1323, 1335 (D.C. Cir. 1979); *Action for Children's Television* v. *FCC*, 564 F.2d 458, 478–79 (D.C. Cir. 1977). The explanation here—that the agency needs time to prepare an RIA required by executive order—is, we believe, sufficient.

The second category of regulations covered by the executive order raises somewhat different legal issues. Under 5 U.S.C. § 553(b), notice and comment procedures must be followed for "rule making" unless

"the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Under 5 U.S.C. § 551(5), the term "rule making" is defined as "agency process for formulating, amending, or repealing a rule." The initial question, then, is whether an agency's decision to "suspend" a final but not effective rule is "rule making" which triggers the procedural safeguards of § 553.

In a recent memorandum, this Office concluded that a 60-day suspension of the effective date of a final rule should not, in general, be regarded as rulemaking within the meaning of the APA.[9] We based our conclusion on "the clear congressional intent to give agencies discretion to extend the effective date provision beyond 30 days" and the absence of statutory language or history suggesting "that a delay in effective date is the sort of agency action that Congress intended to include within the procedural requirements of § 553(b)." Nevertheless, we believe that a short-term suspension of the effectiveness of a final rule is not the equivalent of an indefinite suspension coupled with a process designed to review the basis for the rule, with a view to establishing a new rule. Although the former seems fairly characterized as a mere extension of an effective date under § 553(d), the latter should probably be characterized as "agency process for formulating, amending, or repealing a rule" for purposes of § 553(b).

The difference between these two measures for purposes of § 553 becomes clear upon examination of the sequence of events that is expected to take place under each of them. Under the President's Memorandum of January 29, 1981, 46 Fed. Reg. 11227 (1981), "Postponement of Pending Regulations," agencies are to defer the effective dates of final rules for 60 days in order to review them. The completion of that review will point to either of two dispositions. The rule might be allowed to take effect as published in final form, or it might be withdrawn for some proposed change. The first disposition would require no new procedures. The second disposition would surely contemplate an amendment or repeal of the earlier rule subject to § 553's public procedures, but the earlier deferral of the rule's effective date would remain just that.[10]

---

[9] Memorandum Opinion of January 28, 1981, for Honorable David Stockman, Director, Office of Management and Budget, from Larry L. Simms, Acting Assistant Attorney General, Office of Legal Counsel. [Note: The January 28, 1981, memorandum opinion *(Presidential Memorandum Delaying Proposed and Pending Regulations)* appears in this volume at p. 55, *supra.* Ed.]

[10] Admittedly, one of the purposes of the 30-day effective date provision is to allow agencies to correct errors or oversights in final regulations. *See Final Report of the Attorney General's Committee on Administrative Procedure, Administrative Procedure in Government Agencies,* S Doc. No. 8, 77th Cong , 1st Sess., 114–15 (1941); *Sannon v. United States,* 460 F Supp. 458, 467 (S D Fla. 1978) This purpose, however, does not suggest that agencies may make corrections, let alone withdraw rules, during the period between a rule's publication and its effective date without offering public procedures or showing good cause for dispensing with them. Proposed corrections—or even repeals—would of course be amendments for purposes of § 553(b)

Under the proposed order, the situation is analogous to the second possible disposition under the President's Memorandum. The order, by requiring careful cost-benefit analysis of rules through the RIA process, would contemplate notices of proposed rulemaking on the preliminary RIA and a reexamination of the rule at the appropriate time. The issue to be decided at the time the rule is suspended indefinitely for the order's process to take place is whether the rule, which has already been promulgated in final form, should be allowed to have interim effect while it is under review by the agency. We believe that this decision is one of "formulating, amending, or repealing a rule" that requires either notice and comment procedures or good cause for dispensing with them under § 553(b). Admittedly, the difference between a short deferral of the effectiveness of a rule and an indefinite suspension for reexamination is in part one of degree. But there is also a difference in kind: once a decision to begin the process of amending a rule is made, there is no longer a plausible argument that a rule that was to take effect is merely to be delayed for a brief period.

Notice and comment procedures on the issue of the interim effectiveness of a rule that is due to undergo reexamination under the order should take the following form. The agency should defer the rule's effective date for a period sufficient to allow a short time for notice and comment, an opportunity for the agency to consider the comments and decide the issue of interim effectiveness, and an interval before the rule takes effect sufficient to meet the purposes of § 553(d).

In deciding on the interim effectiveness of final rules subject to the order's procedures, the final question is whether and under what circumstances agencies will have good cause to dispense with notice and comment procedures. Public procedures on interim effectiveness might be "unnecessary, impracticable, or contrary to the public interest," where the question whether there should be any rule at all was fully ventilated in the rule's comment process, or where it is clear that interim effect could impose substantial but short-term compliance costs. On the other hand, notice and comment might be needed where the rule's proponents had advanced substantial arguments for its early effectiveness, and where compliance costs are not likely to be wasted.

Such arguments must, of course, be assessed on a case-by-case basis. If the available record indicates that the costs of the rule at issue are not substantial and that the failure to allow the rule to become effective may itself be controversial, the likelihood that a court will require notice and public comment increases. The procedural requirements of the APA will, therefore, vary with the size and immediacy of the burdens imposed by the rule and the need for public comment on a decision to withdraw a final but not effective rule.

## III. Regulatory Review by Agency Heads

Section 4 of the proposed order would require agency heads to make express determinations that regulations they issue are authorized by law and are supported by the materials in the rulemaking record. These requirements are meant to assure agency compliance with existing legal principles that rules must be authorized by law, and that they should be adequately supported by a factual basis. Accordingly, we find no legal difficulty with them. In particular, they do not purport to change generally applicable statutory standards for judicial review of agency action, *see* 5 U.S.C. § 706, and could not have such an effect. They also do not purport to alter any specially applicable standards, such as those concerning the evidentiary standard that must be met to uphold a given rule, appearing in statutes governing a particular agency.

On the other hand, the section would add the significantly new procedural requirements that agency heads expressly determine that the legal and factual requisites for a rule have been met. The first requirement reflects the principle, central to administrative law, that agency action must be guided by the "supremacy of law." *St. Joseph Stock Yards Co.* v. *United States,* 298 U.S. 38, 84 (1936) (Brandeis, J.). This principle protects against excess of power and abusive exercise of power by administrators. *See Final Report of the Attorney General's Committee on Administrative Procedure, Administrative Procedure in Government Agencies,* S. Doc. No. 8, 77th Cong., 1st Sess. 76 (1941). The requirement that agency heads determine that a rule has "substantial support" in the materials before the agency means that a rule's necessary factual basis must be found to exist. This second requirement should not be confused with a "substantial evidence" standard of judicial review, which could be imposed only by statute. It embodies Recommendation 74-4 (subpart 3) of the Administrative Conference of the United States, 1 CFR § 305.74.4, which urges that for a rule to be considered rational, it should be adequately grounded in a factual basis. This requirement is consistent with the approach of courts that have carefully reviewed agency action under the "arbitrary" and "capricious" standard of the Administrative Procedure Act, 5 U.S.C. § 706 (2)(A). *See, e.g., Ethyl Corp.* v. *EPA,* 541 F.2d 1 (D.C. Cir.) *(en banc),* cert. denied, 426 U.S. 941 (1976).

## IV. Judicial Review

The order states that it is not intended to create any rights or benefits enforceable by a party to litigation against the United States, its agencies, or any other person. At the same time, it provides that determinations of costs and benefits, and the RIA itself, are meant to form part of the agency record for purposes of judicial review. The effect of this provision is to preclude direct judicial review of an agency's compli-

ance with the order. The provision makes clear the President's intention not to create private rights, an intention that should be controlling here. *See Independent Meat Packers Ass'n* v. *Butz,* 526 F.2d 228 (8th Cir. 1975), *cert. denied,* 424 U.S. 966 (1976) (no judicial enforcement of executive order requiring consideration of inflationary impact of regulations, in part because such order had not been issued pursuant to delegation from Congress); *Legal Aid Soc'y of Alameda County* v. *Brennan,* 608 F.2d 1319 (9th Cir. 1979) (judicial review available of compliance with an executive order that had been ratified by Congress). Even without the provision, compliance with the order would probably be immunized from review because the order has not been promulgated pursuant to a specific grant of authority from Congress to the President and thus lacks the "force and effect of law" concerning private parties. *See Independent Meat Packers Ass'n* v. *Butz,* 526 F.2d 228; *National Renderers Ass'n* v. *EPA,* 541 F.2d 1281, 1291–92 (8th Cir. 1976); *Hiatt Grain & Feed, Inc.* v. *Bergland,* 446 F. Supp. 457, 501–02 (D. Kan. 1978). The bar on judicial review of agency compliance with the order does not, of course, prohibit a court from hearing a constitutional or statutory attack on the legality of the order itself or of agency action taken pursuant to its requirements.

Because the regulatory impact analysis that will be required by the order will become part of the agency record for judicial review, courts may consider the RIA in determining whether an agency's action under review is consistent with the governing statutes. This, of course, is true of all matters appearing in the rulemaking record.

## V. Conclusion

The proposed executive order is acceptable as to form and legality.

LARRY L. SIMMS
*Acting Assistant Attorney General*
*Office of Legal Counsel*
